UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
| MARIETTA CHEEKS, ) | Case No. 19-10516-BFK |
| ) | Chapter 13 |
| Debtor. ) | |

**MEMORANDUM OPINION AND
ORDER GRANTING: (A) U.S. BANK NATIONAL ASSOCIATION'S
MOTION TO CONFIRM ABSENCE OF THE AUTOMATIC
STAY (DOCKET NO. 13); AND (B) CLEAR SKY PROPERTIES, LLC'S MOTION
FOR RELIEF FROM THE AUTOMATIC STAY
(DOCKET NO. 32)**

This matter came before the Court on the Motion of U.S. Bank National Association ("U.S. Bank") to Confirm Absence of the Automatic Stay, and on the Motion of Clear Sky Properties, LLC ("Clear Sky") for Relief from the Automatic Stay. Docket Nos. 13, 32. The Motions essentially seek the same relief - U.S. Bank, the former beneficiary of the Deed of Trust at issue in this case, and Clear Sky, the successful bidder at the foreclosure sale of real property located at 17160 Belle Isle Drive, Dumfries, VA (hereinafter, the "Property"), assert that the Property was always titled in the name of the Debtor's husband and that the Debtor had no legal or equitable interest in the Property at the time she filed her bankruptcy petition. U.S. Bank requests, in the alternative, that the Court grant relief from the automatic stay, *nunc pro tunc*. Clear Sky argues, also in the alternative, that if the automatic stay applied to the Property, Clear Sky is entitled to be treated as a bona fide purchaser for value. *See* 11 U.S.C. §§ 549(c), 550(b)(1).

The Debtor opposes both Motions, acknowledging that legal title was in the name of her husband but arguing that she possessed an equitable interest in the Property at the time she filed her bankruptcy petition. She argues that the Deed can and should be reformed under applicable

1

non-bankruptcy law, here the law of Virginia, to include her as a Grantee. Docket Nos. 22 and 37.

The Court heard the evidence and the parties' arguments on June 14 and 24, 2019. The Court finds that the Debtor's evidence falls short of establishing a claim for equitable title and that reformation of the Deed is not available in this case. The automatic stay, therefore, did not come into effect with respect to the Property when the case was filed. The Court further finds, in light of the foregoing, that: (a) U.S. Bank's alternative request for *nunc pro tunc* relief is moot; and (b) the Court need not address Clear Sky's argument that it is a good faith purchaser for value. The Court will grant U.S. Bank's and Clear Sky's Motions.

## Findings of Fact

The Court, having heard the evidence, makes the following findings of fact:

1. The Debtor, Marietta Cheeks, is an individual residing the town of Dumfries, in Prince William County, Virginia.

2. Ms. Cheeks and her husband, Frederick Cheeks, have been married for 43 years. They have two children, who are adults, and two grandchildren.

3. The Property is the Cheeks' principal residence.

4. Mr. Cheeks worked as a lineman for Dominion Power for 45 years. He is now retired.

5. Ms. Cheeks operates a day care business, though she testified that she does not bring any children into the Property and that her activities are largely confined to picking up and dropping off the children from school and from after-school activities.

6. Ms. Cheeks generally handles the family's finances. She pays the bills, handles the bank accounts and prepares the tax returns.

7. U.S. Bank and the Debtor stipulated to the following facts:

    (a) Prior to the foreclosure sale of the property known as 17160 Belle Isle Drive, Dumfries, VA 22026 (the property), Robert Butler contacted Brock & Scott, PLLC and advised the representative for the firm, that Marietta Cheeks has filed bankruptcy and that the sale should be placed on hold.

    (b) Robert Butler is not an attorney licensed to practice law and is not an employee of, or affiliated with Debtor's counsel, Nathan Fisher, or his law firm.

    (c) Brock & Scott, PLLC received notice of Marietta Cheeks' bankruptcy filing from Robert Butler only.

    (d) The Note attached to the Joint Stipulation is a true and exact copy of the original signed Note.

    (e) The Deed of Trust, Deed, & Corrected Deed all attached to the Joint Stipulation are true and exact copies of documents on file in the Prince William Circuit Court Clerk's Office, among the land records for that county.

    (f) The Note and Deed of Trust are signed by Frederick Cheeks.

Joint Stipulation of Facts, Docket No. 55.

    *A. The Contract of Sale.*

8. Mr. and Ms. Cheeks began searching for a home in 2013. They employed a realtor recommended by their daughter, who brought them to the Potomac Shores neighborhood in Dumfries.

9. NVHomes is one of the home builders in the Potomac Shores development.

10. Mr. and Ms. Cheeks visited and viewed model homes. They picked out a lot, and chose the Portsmouth model for their home.

11. On May 17, 2015, Frederick Cheeks individually entered into a Purchase Agreement for the purchase of a home with NVHomes. CSP Ex. 22.[1]

12. The original purchase price was $753,475.00. *Id.*, ¶ 2.

---

[1] Clear Sky's Exhibits are referred to herein as "CSP No. __." U.S. Bank's Exhibits are referred to as "USB No. __." The Debtor's Exhibits are referred to as "DR Ex. __."

13. Apparently on the same day, Frederick Cheeks and his daughter, Kimberly Cheeks, entered into a Purchase Agreement for the purchase of the same property, with the same purchase price. CSP Ex. 23.

14. On May 28 and 29, 2015, Mr. Cheeks individually signed a Change Order Addendum and a Flooring Selection Sheet (together, the "Change Orders") as addenda to the Purchase Agreements. DR Exs. C and D.

15. Ms. Cheeks was the primary point of contact for NVHomes for the selection of finishes and upgrades to the Property. She testified that she was present and assisted her husband on the computer in their home in affixing his electronic signatures to the Change Orders.

16. On October 6, 2015, Virginia Wahab (known to Ms. Cheeks as Ginnie) of NVR Settlement Services e-mailed a letter to Ms. Cheeks. DR Ex. I. The letter enclosed a Tenancy form. Ms. Wahab requested that the form be signed and returned to the closing attorney. *Id.*

17. Mr. Cheeks returned two Tenancy forms to the closing attorney, Benjamin C. Winn. The first (somewhat inconsistently) stated : "Frederick L. Cheeks, Tenants by the Entirety." The second checked the box that stated: "Sole Owner (If you are buying the property alone then this will be your option.)") DR Ex. U.

18. Mr. and Ms. Cheeks understood that Ms. Cheeks would not be a borrower on the mortgage loan because she had student loan debt that would have made approval of the loan more difficult. This notwithstanding, Ms. Cheeks and Mr. Cheeks both testified convincingly that they have always owned their properties jointly during their 43-year marriage and that it was their intent to take title to this Property jointly.

B. *The Applications for Financing.*

19. Mr. and Ms. Cheeks intended to use $400,000.00 of Mr. Cheeks' retirement savings (401(K)) for the down payment, financing the rest of the purchase price with an FHA mortgage.

4

20. Mr. Cheeks submitted three Uniform Residential Loan Applications to NVR Mortgage. DR Exs. O, P, Q. Each of these Applications indicated that Mr. Cheeks was to be the sole borrower, but that title would be taken jointly with Ms. Cheeks. *See* DR Exs. O ("Title held jointly"), P ("Title held jointly"), Q ("Title held jointly").

21. On October 13, 2015, Russell Turner of NVR Mortgage wrote an e-mail to Ms. Cheeks advising her that "we are running into a little issue with regards to the debt to income [ratio] on our end." DR Ex. K. He referred Mr. and Ms. Cheeks to George Mason Mortgage. *Id.*

22. NVR Mortgage sent Mr. Cheeks a Notice of Action Taken, Statement of Reasons and Counteroffer denying loan approval on October 15, 2015. CSP Ex. 37. The stated reason for the denial was "DTI [Debt to Income] – Unreimbursed Exp."[2]

23. Mr. Cheeks then submitted a Uniform Residential Loan Application to George Mason Mortgage. DR Ex. S. The section labeled "Manner in which Title will be held" was left blank. *Id.*

24. George Mason Mortgage approved the loan in the amount of $424,297.00, with an interest rate of 4.0% and a 30-year amortization, on November 25, 2015. CSP Ex. 66.

25. Mr. Cheeks signed a second Uniform Residential Loan Application with George Mason Mortgage as of the date of the settlement on the Property, November 30, 2015. DR Ex. T. This time, the section entitled "Manner in which title will be held" stated: "Married Man." *Id.*

C. *The Closing.*

26. About three weeks prior to the closing, on November 5, 2015, Mr. Cheeks signed a Title Addendum to Purchase Agreement. CSP Ex. 49. The Title Addendum stated that he

---

[2] The First Payment Letter issued at the closing indicated that the monthly mortgage payment would be $3,144.02. CSP Ex. 80. Mr. Cheeks listed his monthly income including overtime as $7,127.82 in his Loan Application with George Mason Mortgage. DR Ex. S, p. 2. Ms. Cheeks' day care business did not appear to contribute significantly to the family's income. CSP Exs. 13 (2012 Tax Return), 14 (2013 Tax Return), 16 (2014 Tax Return), 18 (2015 Tax Return). Thus, the monthly mortgage payment would have been approximately 44% of Mr. Cheeks' gross (i.e., before tax) monthly income.

5

wished to add Ms. Cheeks as an Additional Title Holder. It further stated the following conditions:

> (a) Purchaser shall provide Seller written evidence from the Lender (as defined in the Agreement), satisfactory to Seller in its sole discretion, that adding the Additional Title Holder to the deed of conveyance shall not affect Purchaser's ability to obtain a loan from Lender. In the event that Purchaser does not provide such written evidence to Seller prior to Settlement, title shall be conveyed to Purchaser as provided in the Agreement.
>
> (b) Purchaser agrees that adding the Additional Title Holder to the deed of conveyance shall in no way delay, prevent, or otherwise adversely affect Settlement as contemplated under the Agreement, and any such delay, failure to obtain financing, or failure to settle due, in Seller's sole determination, to the addition of the Additional Title Holder, shall be a default under the terms of the Agreement.

*Id.*, ¶¶ 2 (a) and (b).

27.     The closing on the sale of the Property took place on November 30, 2015. CSP Ex. 83 (HUD-1 Settlement Statement). Ms. Cheeks testified that she and Mr. Cheeks had to wait for two closings to be completed before theirs, and that when it came to their closing they felt very rushed.

28.     The final purchase price with all of the additions and upgrades was $859,400.00. *Id.*, Line 401. The Cheeks paid $418,929.06 in cash at closing, in addition to their $30,000.00 deposit, both of which came from Mr. Cheeks' 401(K) retirement account. *Id.*, Lines 507 (Deposit), 303 (Cash from Borrower).

29.     The Deed to the Property from NVR, Inc., identified Mr. Cheeks as the sole Grantee. CSP Ex. 7 (recorded 12/2/2015).[3]

30.     Mr. Cheeks signed the Note payable to George Mason Mortgage; Ms. Cheeks did not. CSP Ex. 6.

---

[3] NVR, Inc. later recorded a Correction Deed, which included information concerning the Cherry Hill Community Development Authority District (CDA). CSP Ex. 7. Ms. Cheeks was quite unhappy to learn after the closing that she and Mr. Cheeks would owe taxes to two taxing authorities – Prince William County and the Cherry Hill CDA (in addition to their Homeowners Association dues).

31. Mr. Cheeks executed the Deed of Trust as "Frederick Cheeks, Married Man." CSP Exs. 3, 4.

32. No evidence was presented that Mr. and Ms. Cheeks ever complied with the condition stated in paragraph 2(a) of the Title Addendum, which required the written consent of the lender.

33. Ms. Cheeks testified that she did not notice at the closing that the Deed was made out solely to Mr. Cheeks as Grantee and that she was not on the Deed. In fact, she testified, she was not aware of this until after she filed her bankruptcy petition in this case in February 2019.

34. Mr. and Ms. Cheeks moved into the Property on December 20, 2015.

35. The servicing of their loan was later transferred to U.S. Bank. U.S. Bank. CSP Ex. 88.

D. *The Prior Bankruptcy Cases.*

36. Mr. Cheeks received a discharge in a Chapter 7 case in 2013 (before the Cheeks' purchase of the Property). *In re Frederick Lee Cheeks*, Case No. 13-13628-BFK.[4]

37. Ms. Cheeks filed two previous bankruptcy cases. The first case was a Chapter 13 case filed in September 2003, and was dismissed in June 2004. *In re Marietta Cheeks*, Case No. 03-14173-SSM. The second case was filed as a Chapter 13 case in August 2004, and was dismissed in November 2004. *In re Marietta Cheeks*, Case No. 04-13487-SSM. Both of these cases preceded, by many years, the Cheeks' purchase of the Dumfries Property.

38. After defaulting on the loan with U.S. Bank, Mr. Cheeks filed two Chapter 13 cases. *In re Frederick L. Cheeks*, Case No. 17-14027-KHK; *In re Frederick L. Cheeks*, Case No. 18-13245-KHK. The first case was dismissed for failure to pay the filing fee and the failure to

---

[4] The Court can take judicial notice of its own records. *In re Heilig-Meyers Co.*, 328 B.R. 471, 488-89 (E.D. Va. 2005); *In re Rivera*, No. 13-14351-BFK, 2014 WL 287517, at *2 n.2 (Bankr. E.D. Va. Jan. 27, 2014); *In re Ryan*, 472 B.R. 714, 727-28 (Bankr. E.D. Va. 2012); *In re Giordano*, 472 B.R. 313, 335 n.15 (Bankr. E.D. Va. 2012).

7

file Lists, Schedules and a Chapter 13 Plan. Case No. 17-14027-KHK, Docket No. 16. The second case was dismissed for the same reasons. Case No. 18-13245-KHK, Docket No. 21.

   *E.  Ms. Cheeks Files the Instant Bankruptcy Case.*

39.   Ms. Cheeks filed this case as a Voluntary Petition under Chapter 13 at 4:00 p.m. on February 16, 2019. Docket No. 1. She was represented by counsel in the filing. *Id.*

40.   Ms. Cheeks testified that she and Mr. Cheeks had consulted with an attorney from California who advised them that Mr. Cheeks was not eligible to file another bankruptcy petition because of his previous bankruptcy cases.

41.   Ms. Cheeks' Schedule A/B lists the Property as being "Owned as husband and wife." Docket No. 16, Schedule A/B.

42.   She listed the Property with a value of $989,000.00, and with secured debt in the amount of $420,000.00 as of the petition date. *Id.*, Schedules A/B, D.

   *F.  The Foreclosure of the Property and the Sale to Clear Sky.*

43.   Ms. Cheeks testified that they were able to make the payments for about one year, through December 2016. The last payment that she and Mr. Cheeks made to U.S. Bank was in early 2017.

44.   Ms. Cheeks worked on a loan modification and hired a company to help her in that effort. She testified that she sent all of the required documents to U.S. Bank in January 2017, and that she and Mr. Cheeks were approved for a reduced monthly payment of $2,889.00. She testified that they made these payments in February and March 2017.

45.   In April 2017, U.S. Bank started returning the payments and asserted that they were again in default. As a result, Mr. and Ms. Cheeks stopped making payments to U.S. Bank in April 2017 and thereafter.

46.   U.S. Bank noticed a foreclosure on the Property for the morning of February 19, 2019, at 2:00 p.m. USB Ex. 8.

47. Charles Einsmann, Clear Sky's Managing Member, testified that this was the third time that the Property had been noticed for a foreclosure, the first two having been stayed by Mr. Cheeks' bankruptcy filings.

48. On February 19th, just before conducting the foreclosure, the Substitute Trustee called his office to determine whether the record titleholder, Mr. Cheeks, had filed a bankruptcy petition; the answer was no. Unbeknownst to the Substitute Trustee, Ms. Cheeks had filed her Voluntary Petition on February 16th, three days before the foreclosure sale.

49. Clear Sky was the successful bidder at the foreclosure, having bid $493,624.00. USB Ex. 7. The Substitute Trustee signed a Memorandum of Trustee's Foreclosure Sale dated February 19, 2019, and Clear Sky paid the Substitute Trustee $45,000.00 as a deposit. *Id.*

50. Both Mr. and Ms. Cheeks testified that, in their view, the Property has a value of approximately what they paid for it, $859,000.00.

51. Mr. Einsmann was not able to conduct an inspection of the Property before he made the bid at the foreclosure sale. He testified that Clear Sky generally calculates its bids at foreclosure sales based on neighborhood comparable sales, less anticipated costs for the repair and renovation of the property. In Mr. Einsmann's words, "we buy wholesale, and we sell retail." In this case, Mr. Einsmann estimated the "after-repair" value of the Property to be, conservatively, $750,000.00.

52. Mr. Einsmann further testified that the values in this neighborhood for secondary sales were somewhat depressed (perhaps 5 to 7% of their value) owing to the fact that NV was still selling homes in the project, so sellers are still competing against the builder of the homes.

53. He further estimated the repairs for this Property, a new property which has been well-maintained, to be approximately $30,000.00. Thus, his "before repair" value was approximately $700,000.00. Clear Sky's foreclosure bid represented 70% of Mr. Einsmann's

9

estimated pre-repair value of $700,000.00, but only 57% of the Cheeks' valuation of $859,000.00.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the estate) and (G) (motions to terminate, annul or modify the automatic stay).

Section 362(d)(1) of the Code allows the automatic stay to be terminated for cause, including a lack of adequate protection. 11 U.S.C. § 362(d)(1). Clear Sky and U.S. Bank seek relief from the automatic stay to complete the foreclosure sale by recording a Trustee's Deed to the Property and to proceed with State law remedies to gain possession of the Property. Here, there is cause to grant Clear Sky's and U.S. Bank's Motions because the Property never constituted property of Ms. Cheeks' bankruptcy estate.

A. *Property of the Estate and the Automatic Stay.*

The nature and extent of the bankruptcy estate's interest in property is determined under State law, unless there is a competing bankruptcy law consideration, which there is not in this case. *Butner v. U.S.* 440 U.S. 48, 55 (1979). Bankruptcy Code Section 541(a)(1) provides that property of the estate shall consist of "all of the following property wherever located *and by whomever held*… [including] all legal *and equitable interests* of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added).

The automatic stay precludes creditor action against property of the estate, with certain exceptions not relevant here. 11 U.S.C. § 362(a). A number of courts have held that the automatic stay can extend to a debtor's equitable interest in property, where title to the property is recorded in another entity. For example, in *In re Ealy*, the bankruptcy court held that the automatic stay protected certain property that was held in the name of a limited liability company

                                        Document      Page 11 of 14

because the Deed should have been in the names of the Debtors. 307 B.R. 653, 657-58 (Bankr. E.D. Ark. 2004). In *Ford v. A.C. Loftin (In re Ford)*, the bankruptcy court held that "the Debtor has a continuing beneficial ownership interest in the residence on the basis of an implied trust under Georgia cases." 296 B.R. 537, 543 (Bankr. N.D. Ga. 2003). In *Fadel v. DCB United LLC (In re Fadel)*, the Ninth Circuit Bankruptcy Appellate Panel employed a "form of title" presumption – that the description of title in the deed presumptively reflects actual ownership – but that this presumption could be rebutted by a showing of undue influence in the transaction. 492 B.R. 1, 11-12 (9th Cir. B.A.P. 2013).

Ms. Cheeks, therefore, could possibly demonstrate that the Property was titled solely in her husband's name as a product of a mutual mistake, for which she would be entitled to a reformation of the Deed under State law.

  B. *Virginia Law on Mistake, Equitable Title and Reformation.*

The legal burden to demonstrate an entitlement to reformation of instruments as a result of a mutual mistake is a heavy one in Virginia. In *Gibbs v. Price*, the Virginia Supreme Court held:

> Equity has undoubted jurisdiction to reform an instrument if it does not express the intent of the parties. Equity should give effect to the true intent of the parties, despite a contrary intent reflected by a writing the parties mistakenly believed to monument their bargain. But equity should not act lightly…. To support reformation on the ground of mutual mistake, *the proof 'must be clear and satisfactory, leaving but little, if any, doubt of the mistake'*.

150 S.E.2d 551, 552 (Va. 1966) (emphasis added).[5]

In determining whether a mutual mistake has been made, "'the inquiry is not ... who initially made the mistake, but rather, whether each party held the same mistaken belief with respect to a material fact at the time the agreement was executed.'" *Tiger Fibers, LLC v. Aspen*

---

[5] Virginia law also allows for reformation where the mistake is unilateral, but is accompanied by a misrepresentation or fraud by the other party to the instrument. *Ward v. Ward*, 387 S.E.2d 460, 462 (Va. 1990). There is no suggestion in this case that NV committed a fraud at the closing.

11

*Specialty Ins. Co.*, 594 F. Supp. 2d 630, 643 (E.D. Va. 2009) (insurance policy reformation; citations omitted).[6]

    *C. The Application of Virginia Law to the Facts of this Case.*

The Court found Ms. Cheeks' and Mr. Cheeks' testimony to be highly credible on the issue of how they intended to take title. Mr. and Ms. Cheeks have been married for 43 years. They have always acted jointly in their financial affairs. Ms. Cheeks acknowledged that she was not going to be a borrower on the mortgage loan because of her student loan debt, but she was adamant that she was to be on the title. Although Clear Sky introduced evidence that Mr. and Ms. Cheeks may have significant tax problems with the IRS, this did not shake the Court's conclusion on the core issue that Mr. and Ms. Cheeks intended to take title jointly to their home.

This is not the end of the matter, however, because Mr. and Ms. Cheeks were not the only parties to the transaction. NVHomes was the seller and George Mason Mortgage was the lender and the beneficiary of the Deed of Trust (later assigned to U.S. Bank). The Title Addendum clearly indicated that Mr. Cheeks intended to add Ms. Cheeks as an Additional Title Holder. CSP Ex. 49. However, just as clearly, the Title Addendum contained the condition that Mr. and Ms. Cheeks produce the written consent of the lender. *Id.*, ¶ 2(a). Mr. Cheeks signed this on November 5, 2015, about three weeks before the closing, so there was time to obtain the lender's

---

[6] Although Ms. Cheeks did not press the issue at the final hearing in this matter, her pleadings allude to the fact that this Property was marital property under Virginia law. *See* Docket Nos. 22, ¶ 8 ("the debtor asserts an equitable interest in the $400,000.00 in marital equity in the subject property"), 37, ¶ 11 (same). The Court agrees with the bankruptcy court's analysis in *In re Balzano,* 399 B.R. 428 (Bankr. D. Md. 2008), that this would have been insufficient to cause the Property to become property of Ms. Cheeks' bankruptcy estate. Under Va. Code § 20-107.3(A), the Circuit Court "upon decreeing the dissolution of marriage" shall determine "the legal title as between the parties." The statute further provides that all orders or decrees that divide or transfer property between the parties shall be indexed and recorded in the city or county where the property is located. Va. Code § 20-107.3(C). The statute expressly states:

> For the purposes of this section only, both parties shall be deemed to have rights and interests in the marital property. However, *such interests and rights shall not attach to the legal title of such property* and are only to be used as a consideration in determining a monetary award, if any, as provided in this section.

Va. Code § 20-107.3(B) (emphasis added). Of course, in this case, Mr. and Ms. Cheeks never instituted divorce proceedings and a decree with respect to the Property was never recorded.

written consent in advance of the closing. There was no evidence presented that Mr. and Ms. Cheeks ever requested the lender's consent. A representative of George Mason Mortgage did not testify, and the Court is left to speculate as to whether it would have consented to adding Ms. Cheeks as a record title holder. NV, the Grantor of the Deed, had no real interest in the identity of the party or parties to whom it was granting title, but it did require a written statement from the lender that adding Ms. Cheeks to the title was acceptable and would not delay the closing for any reason. The Title Addendum indicates that Mr. and Ms. Cheeks were aware that Ms. Cheeks would not be on the title and that, unless they produced a letter from George Mason Mortgage consenting to adding Ms. Cheeks to the title, only Mr. Cheeks would be on the Deed as the Grantee. Having heard the evidence, the Court is constrained to hold that the Cheeks' proof fell short of their burden to demonstrate a mutual mistake under Virginia law.

The Court is aware that this is a highly unfortunate result for Mr. and Ms. Cheeks. Mr. Cheeks was in fact eligible to file a bankruptcy petition in his own name, despite the fact that it would have been his third bankruptcy case (he would have had the benefit of the automatic stay for 30 days had he filed a third case, because a new case would have been his second case within 12 months; he could have moved to extend the automatic stay under Bankruptcy Code Section 362(c)(3)). Mr. Cheeks put over $400,000.00 of his hard-earned 401(K) savings into this property. Clear Sky purchased the property for a foreclosure bid of only $493,000.00. Virginia law, however, requires clear and satisfactory proof of a mutual mistake, not a unilateral misunderstanding.[7]

The Court, therefore, will grant Clear Sky's and U.S. Bank's Motions for Relief from the Automatic Stay.

---

[7] It is possible that, had Mr. and Ms. Cheeks known that Ms. Cheeks was not on the title, Mr. Cheeks could have transferred the property to himself and Ms. Cheeks as joint tenants or tenants by the entirety without triggering a due on sale clause from the lender. *See* 12 U.S.C. § 1701j-3(d)(6) (preempting State law on due on sale clauses where the transfer is to a spouse); 12 CFR § 591.5 (same).

**Conclusion**

For the foregoing reasons it is **ORDERED**:

1. U.S. Bank's and Clear Sky's Motions for Relief from the Automatic Stay are both granted, to permit them to record a Trustee's Deed and to exercise their State law remedies with respect to possession of the Property.

2. The Clerk will mail copies of this Memorandum Opinion and Order, or will provide cm-ecf notice of its entry, to the parties below.

Date: Aug 12 2019                    /s/ Brian F. Kenney
_____                  _____
                                     Brian F. Kenney
Alexandria, Virginia                 United States Bankruptcy Judge

                                     Entered on Docket: August 13, 2019

Copies to:

Marietta Cheeks
17160 Belle Isle Drive
Dumfries, VA 22026
*Chapter 13 Debtor*

Nathan A. Fisher, Esquire
3977 Chain Bridge Road, #2
Fairfax, VA 22030
*Counsel for Debtor*

Edward J. Grass, Esquire
9501 Burke Road #10784
Burke, VA 22015
*Counsel for Clear Sky Financial, LLC*

M. Christine Maggard, Esquire
Brock & Scott, PLLC
484 Viking Drive, Suite 203
Virginia Beach, VA 23452
*Counsel for U. S. Bank, National Association*

Thomas P. Gorman, Esquire
300 N. Washington St. Ste. 400
Alexandria, VA 22314
*Chapter 13 Trustee*